IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TROY BISHOP,
      Petitioner,

vs.                           Case No.: 4:15cv160/MW/EMT

STATE OF FL DEP'T OF CORR.,
      Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 21).  Petitioner filed a reply (ECF No. 24).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 23).[1]  Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2011-CF-135, with one count of burglary of a dwelling (Count I), two counts of dealing in stolen property (Counts II, IV), two counts of defrauding a pawnbroker (Counts III, V), and one count of grand theft ($300 or more but less than $5,000) (ECF No. VI) (Ex. A at 9–10).  Following a jury trial, Petitioner was found not guilty of the burglary count, but guilty as charged on the remaining counts (Ex. A at 43–48, Ex. B).  On February 14, 2012, the trial court adjudicated Petitioner guilty of Counts II–VI, and sentenced him to concurrent terms of ten years in prison, with pre-sentence jail credit of 391 days, followed by five years of probation as to Counts II, III, and IV, and terms of five years in prison, to run concurrently with the 10-year sentence on Count II, as to Counts V and VI (Ex. A at 54–71, 83–114).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-1377 (Ex. C).  In an order rendered June 18, 2013, the First DCA reversed and remanded for the trial court to vacate

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 21, 23).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner's conviction for theft (Count VI), but affirmed Petitioner's convictions on the remaining Counts (Ex. F).  The mandate issued July 5, 2013 (Ex. G).  Bishop v. State, 114 So. 3d 1123 (Fla. 1st DCA 2013).  On remand, the trial court vacated the judgment and sentence as to Count VI and directed the clerk of court to prepare an amended judgment nunc pro tunc to February 14, 2012 (Ex. H).  Petitioner sought discretionary review of the First DCA's decision in the Florida Supreme Court, Case NO. SC13-1418 (Ex. I).  The supreme court denied the petition for discretionary review on April 3, 2014 (Ex. J).  Bishop v. State, 139 So. 3d 884 (Fla. 2014) (Table).

On April 15, 2014, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. K at 1–13).  The state circuit court summarily denied the motion on May 15, 2014 (*id.* at 46–49).  Petitioner appealed the decision to the First DCA, Case No. 1D14-2665 (Ex. K at 307–08, Ex. L). The First DCA affirmed the judgment per curiam without written opinion on October 8, 2014, with the mandate issuing November 4, 2014 (Exs. N, O).  Bishop v. State, 150 So. 3d 1135 (Fla. 1st DCA 2014) (Table).

Petitioner filed the instant federal habeas action on March 16, 2015 (ECF No. 1).

II.   TRIAL EVIDENCE

A review of the evidence adduced at Petitioner's trial is helpful to the court's review of his federal habeas claims.  Tallahassee Police Officer Ronald Roberts

testified that on December 22, 2010, he responded to a suspicious incident call on Marion Drive in Tallahassee, Florida (Ex. B at 37–38).  Officer Roberts testified that the homeowner, James Eugene "Gene" Kelly, reported that he had returned home to find the front door of his home unlocked and certain items out of place (*id.* at 38–39). Officer Roberts testified that  he did not observe any damage to the doors or windows of the home, nor did he observe anything out of order, except a sock on the floor, which Mr. Kelly had reported was out of place (*id.* at 39–40).  Officer Roberts testified that Mr. Kelly made a list of the items that were missing from his home (*id.* at 40–41).

Mr. James Eugene "Gene" Kelly testified that on December 22, 2010, he returned to his home on Marion Avenue at approximately 9:00–10:00 p.m (Ex. B at 51–52).  Mr. Kelly testified that he noticed that things were not in the same place as they had been when he left (*id.* at 52–53).  Kelly testified that a jewelry case was missing from the top of a bedroom dresser, and his mother's silver flatware was missing from the dining room (*id.* at 53–54).  Mr. Kelly also testified that some "bank bags" were missing, which contained a checkbook, check registers, and bank statements (*id.* at  54).  Mr. Kelly testified that Petitioner is the son of his (Kelly's) estranged wife, Marsha Kelly (*id.* at 57–58).  Mr. Kelly testified that he and Marsha Kelly had been separated for five years and lived in separate residences (*id.* at 58).  Mr. Kelly testified that he lived at the Marion Avenue home, and Marsha Kelly lived in a home on Francisco Drive that they

had shared during the marriage (*id.*).  Mr. Kelly testified that he and Marsha Kelly

never lived together at the Marion Avenue home (*id.*).  Mr. Kelly testified that after

Marsha Kelly passed away on December 30, 2010 (eight days after the burglary), he

went to the home on Francisco Drive, and Petitioner showed him "a handful of

money" (*id.* at 64).  Mr. Kelly testified that Petitioner commented that it was "hundreds

of dollars" (*id.* at 64–65).  Mr. Kelly testified that one of the items that he noticed

missing from his home on December 22, was $900.00 that he had placed in an

envelope in his dresser drawer, intending to deposit it in the bank (*id.* at 65).  Mr. Kelly

testified that he then began calling pawn shops in an attempt to locate the other items

missing from his home (*id.* at 66).  Kelly testified that over the next few days, he went

to Treasure Hut and inquired about the silver flatware, but was told that it was not

there (*id.* at 67).  Mr. Kelly testified that Treasure Hut subsequently notified either him

or the police that silver flatware had come into the shop, so Kelly went to Treasure Hut

and identified the silver as his mother's (*id.* at 69–70).  Mr. Kelly testified that he also

recovered from Treasure Hut a green Barnett Bank bag, in which he kept the silver

flatware, and a wedding band with the date June 14, 1969 inscribed on it (*id.* at 74–75).

Mr. Kelly identified photographs of the items (State's Composite Exhibit 1A–1D), and

the photographs were admitted into evidence (*id.* at 75–76).  Mr. Kelly testified that

police recovered other missing items at Capital Coin & Diamond, Inc., including his

father's 1935 class ring, his father's jade cuff links, and his father's wedding band engraved with his parents' initials and wedding date (*id.* at 77–79).   Mr. Kelly identified photographs of the items (State's Composite Exhibit 2A–2G), and the photographs were admitted into evidence (*id.*).   Mr. Kelly testified that he never gave anyone permission to enter his home on December 22, 2010, or to take those items from his home (*id.* at 80–81).   Kelly testified that he never gave Petitioner permission to pawn the items that were taken from his home (*id.* at 81).

Paul Sampson testified that he is the owner of Capital Coin & Diamond, Inc. (Ex. B at 92).   He testified that Capital Coin & Diamond is a coin shop and jewelry store (*id.*).   Sampson testified that he buys broken gold, silver chains, jewelry, and similar items (*id.*).   He testified that he also repairs jewelry (*id.*).   Mr. Sampson testified that he has a "buying license," but not a pawnbroker's license (*id.*).   When asked the difference between the two, he responded, "The difference is, with a buying license, I buy things.  I hold them 15 days, you know, for this case, in case something is stolen.  A pawn license is for a longer period of time and it's loaning money on the items.  So when you sell it to me, you're actually selling it to me." (*id.* at 93).   The prosecutor asked Sampson about the process of a person's selling him an item of jewelry:

> Q.  How does somebody go about selling you an item of jewelry?

A.  Well, they bring an item in and say, I have this for sell [sic], you know, rings or chains or whatever.  First thing I do is determine whether it's gold or not.  Take a magnifying glass, look on the inside.  Look for the purity marking.  It will be 10, 14, 18 carat, whatever the marking is. Then once I sort it by purities, then I weigh it.  I use—a pennyweight system is what I use, but we can use grams or grains.  But pennyweight is generally what the world lives with.  Once I sort it by purity—say, it's 10 carat and I'm paying, say, $22 a pennyweight for 10 carat.  You got 10 pennyweight.  I'll pay you $220 for it.  The same with 14, 18, or whatever the purity is.

Q.  Okay.  Whenever somebody brings an item to you, do you have any questions about their ownership of the item and insure that they are, in fact, the owner of the item?

A.  Generally, for the most part, you look at people and you look—you try not to judge everybody in life, but you look at them and say this item belongs to this person.  If someone sells you a class ring, you know, they're born in 1965, their class ring should be somewhere in the early '70s generally speaking.  And things like class rings have their names, at least their initials on the inside, or, you know, it'll say Dave on the side of the ring.  They played soccer or something in high school or something like that.

If you look at somebody that's selling something that doesn't match their age group, it tends to get your attention any way.  You look at it and go, well, you know, maybe it's his father's, maybe it's his grandfather's, you know, things like that.  But unless—unless they tell me it's stolen, I don't make that assumption particularly.

Q.  So you—you look at the items, make a determination about whether it matches up or not.  If it doesn't, you ask further questions?

A.  Yeah.  I ask more then.  And sometimes, you know, if I'm really, really, really suspicious of somebody, you know, I'll look on there and say, well, I will, what we call, lowball them.  I'll offer them a price for the items hoping they sell it under the context, at least we'll get the

items.  Now we can start looking for this person.  I'm willing to pay a certain amount of money to take these off the street.  I'm willing—I don't want to pay a $1,000 to get someone off the street, but I'm willing to pay a couple hundred dollars to get somebody off the street, you know, so—and I will do that.  I will do that on—regularly.  If someone comes in, I see them more than once or twice, I go, you know, something's—something's a little hinky [sic] here now, so—

Q.  Do you have any—any steps that you take there whenever somebody does bring an item in to determine who the identification is of the person that's actually selling the item?

A.  Well, we require—the government requires government ID—issued ID, a driver's license, state ID card, passport probably—because passports don't have your addresses on them, so we usually require a driver's license, military ID, or state issued ID card is what we require to sell to us.  Other people might have less standards for that, but I use driver's license, state ID card almost 99 percent of the time.

Q.  Whenever somebody comes in, then, and they've got an item to sell you, you take your weight on it, make a determination of how much value, look at the identification.  Is there any kind of forms that y'all fill out when there's an item being [s]old?

A.  We have a blank form or the pawn ticket, whatever you want to call it, that we've had in Tallahassee since the '70s.  In fact, I used to work at the early Treasure Hut when it first opened up.  We actually designed the form that we now—the City now uses.  It's based on that system we designed way back then.  And it has on there, you fill out their name, their address, phone numbers, where they work, if they have a job, the phone number of the workplace.  We copy down all the things that are on the driver's license.  Now, the driver's license doesn't have weight and eye color, and hair color on there generally, but I do make a note of that.  I'll look up and see if they got brown or blue eyes, you know, black or gray or blond hair or something like that.

> Q.  Is there a place on the form that somebody has to sign in order to insure to you that they are, in fact, the owner of the property that is being pawned or sold?

> A.  It's on the very bottom.  There's a—on the bottom of the form it says, is this property yours to sell?  And then they sign on that.  Then we take the right thumbprint.

(Ex. B at 94–97).  Mr. Sampson was shown State's Composite Exhibit 2A–2G, and he identified the items in the photographs as items that were "pawned . . . or sold" to him by Petitioner (Ex. B at 99).  Mr. Sampson testified that Petitioner received $225.00 for the items (*id.*).  Mr. Sampson identified State's Exhibit 3 as the form that was filled out when Petitioner sold the items, and the form was admitted into evidence (Ex. B at 97–98; *see also* Ex. K at 303–04).  The State and the defense stipulated on the record that Petitioner was the person who "pawned" the items described on State's Exhibit 3 (Ex. B at 98).

Rory Coughlin testified that he was working at Treasure Hut in December of 2010 (Ex. B at 101).  Mr. Coughlin testified that Treasure Hut was a "secondhand dealer" (*id.*).  He described the business as follows:

> Q.  What kind of business does Treasure Hut do?  I understand it's secondhand buying.  What does that mean?

> A.  It's basically a pawnshop but without the pawn.  All we do is buy.  We don't pawn.  We don't hold loans against anything that we purchase or take in.

Q.  Okay.  How does someone go—or how does somebody go about pawning something at Treasure Hut?

A.  They bring the items in.  We look at them.  We make them an offer.  We take their identification.  We fill out the paperwork.  And then we give them the cash we offered them for it.

Q.  Okay.  You mentioned that you take their identification?

A.  Yes.

Q.  Is that to insure the person that's pawning the item is the person that's standing in front of you?

A.  Yes, sir.  That, and we're required by law to fill out the Florida Pawnbrokers form.

Q.  Okay.  Are there any questions that you ask regarding ownership of that particular item to make sure they are, in fact, the owner of this pawning?

A.  When they sign at the bottom, there's a place that says they acknowledge that there's no liens or holds against the equipment, like, they haven't pawned it somewhere else or they haven't—and they are who they say they are.  I don't remember what the exact description of that paragraph is at the bottom of the paperwork.

Q.  Is that on the standard form you just talked about, the pawn ticket?

A.  Yes, sir.

(Ex. B at 101–02).  Mr. Coughlin identified State's Exhibit 4 as the form that he previously described, and it was admitted into evidence (*id.* at 103–04).  The form is titled Second Hand Dealer's Property Form (*see* Ex. K at 306).  The parties stipulated

on the record that "the items that were pawned that day were, in fact, pawned by Mr. Troy Bishop" (Ex. B at 104). Mr. Coughlin was then shown State's Composite Exhibit 1A–1D, and he identified them as photographs of items that Petitioner sold him (*id.* at 99). Petitioner received $320.00 for the items (*id.*).

John McDowell testified that he knows Petitioner through working with him, and as a friend of the family (Ex. B at 106). McDowell testified that around the time that Mr. Kelly's house was burglarized, Petitioner asked McDowell to pawn some items for him, because Petitioner stated he lost his ID (*id.* at 107–08). McDowell testified that he did not pawn the items for Petitioner (*id.* at 108). McDowell testified that Petitioner had asked him to pawn items for him on multiple occasions in the past (*id.*).

Michael Goldwich, an investigator with the Tallahassee Police Department, testified that he located items stolen from Mr. Kelly's home at two "secondhand dealers," Capital Coin & Diamond, Inc. and Treasure Hut (Ex. B at 110–12).

Following the State's presentation of testimony, defense counsel moved for a judgment of acquittal ("JOA") solely on the burglary count, stating, "I would argue to the Court that under the presumption of recently stolen property, I really don't have a leg to stand on on all the counts but Count I, which deals with the burglary." (Ex. B, at 145–46). The court denied the motion for JOA (*id.* at 147).

The defense presented testimony of Lora Rowe, Petitioner's girlfriend.  Ms. Rowe testified that in December of 2010, she was living with Petitioner in a house on Francisco Drive owned by Marsha Kelly and Gene Kelly (Ex. B at 166–67).  Ms. Rowe testified that on December 22, 2010, Marsha Kelly asked her to drive her to Gene Kelly's residence on Marion Avenue so she could ask Gene to loan her some money for Christmas (*id.* at 168).  Ms. Rowe testified that she drove Marsha Kelly to Gene Kelly's house and watched her go to the door (*id.*).  Rowe testified that no one answered the door, so Marsha went around to the back of the house (*id.* at 169, 173–75).  Ms. Rowe testified that fifteen to twenty minutes later, Marsha Kelly returned to the car carrying a large gift bag, a 2-foot by 2-foot square cardboard box, and $100.00 in cash (*id.*).  Ms. Rowe testified that the next day, Marsha asked her son, Petitioner, to take the items in the bag to the pawnshop and pawn them (*id.* at 170, 177).  Rowe testified that Marsha Kelly died seven days later on December 30 (*id.*).  Rowe testified that she told Petitioner that Marsha had gotten the items from Gene Kelly's house (*id.* at 172, 177).

Following the defense's presentation of testimony, defense counsel renewed the motion for JOA as to Count I (Ex. B at 182–83).  The court denied the motion  (*id.* at 183).

In closing argument, defense counsel argued the theory that it was Petitioner's mother, Marsha Kelly, who had entered Gene Kelly's home and taken the property in question, and that Petitioner legally pawned the items at his mother's request, believing that the property was rightfully hers as the spouse of Gene Kelly (Ex. B at 217–31).

As previously noted, the jury acquitted Petitioner of the burglary charge, but found him guilty of the remaining counts.

## III.   STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of

the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the

court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed.

2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843,

152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court

in determining whether its decision was contrary to federal law).  "In determining

whether a state court's decision represents an unreasonable application of clearly

established federal law, a federal court conducting habeas review 'may not issue the

writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272,

1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter,

562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's

"unreasonable application" standard focuses on the state court's ultimate conclusion,

not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under

§ 2254(d), a habeas court must determine what arguments or theories supported or

could have supported the state court's decision, and then ask whether it is possible that

fairminded jurists could disagree that those arguments or theories are inconsistent with

the holding in a prior decision of the Supreme Court.  *See* Richter, 562 U.S. at 102; *see*

*also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than

those articulated by the state court in determining that habeas relief was not warranted,

so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and

convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

## IV.   PETITIONER'S CLAIMS

A.      Ground One: "Ineffective assistance of counsel: counsel failed to move for judgment of acquital [sic]."

Petitioner claims that defense counsel was ineffective for failing to move for a JOA as to the two counts of defrauding a pawn broker, a violation of Florida Statutes § 539.001(8)(b) (ECF No. 1 at 5–8).[3]  Petitioner alleges the evidence at trial established that the victim of each count was not a licensed pawn broker, but instead a secondhand dealer.  Petitioner contends he was prejudiced by counsel's failure to move for a JOA, because he was convicted of crimes that did not occur, and he was deprived of meaningful appellate review of the issue.

Respondent concedes that Petitioner exhausted this claim of ineffective assistance of trial counsel ("IATC") in the state courts by presenting it as Grounds One and Two of his Rule 3.850 motion (ECF No. 21 at 11).  Respondent contends the state court's adjudication of this IATC claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings (*id.* at 11–20).

1.      Clearly Established Federal Law

---

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  <u>Strickland</u>, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do."  <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have

done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a

preponderance of evidence," that counsel's errors affected the outcome.  Strickland,

466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland

for a state court to reject an ineffectiveness claim for failing to prove prejudice by a

preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the

particular decisionmaker," as the court should presume that the judge or jury acted

according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a

conviction, the question is whether there is a reasonable probability that, absent the

errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

Further, when the claimed error of counsel occurred at the guilt stage of trial (instead

of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on

appeal.  See Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland,

466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's

findings of historical facts in the course of evaluating an ineffectiveness claim are

subject to the presumption of correctness, while the performance and prejudice

components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier

v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

> 2.      Federal Review of State Court Decision

Petitioner raised this claim as Grounds One and Two in his Rule 3.850 motion

(Ex. K at 3–7).  The state circuit court adjudicated the claims as follows:

> In grounds 1 and 2, defendant contends that he was prosecuted
> under the wrong statute.  He argues that he should have been prosecuted
> under section 538.04, Florida Statutes, rather that section 539.001, Florida
> Statutes.   In other words, he contends his fraud was against a second
> hand dealer, not a pawnbroker, and if Mr. Chin [defense counsel] had
> raised this issue by judgment of acquittal, he would have been acquitted.
> There are several problems with defendant's assertion.
>
> If counsel had proceeded as defendant suggests, at judgment of
> acquittal time the defense would have been raising a technical defect in
> the information.  In all likelihood, the Court would have allowed an oral
> amendment to the information.  The elements of the crime under sections
> 538.04 and 539.001 would be identical except as to the definition of the
> entities involved.  *(Attachment B - Jury instructions, pages 1–6)*.  The
> essence of the offense relates to whether the defendant falsely verified his
> ownership of the property.  This would be the same issue under either
> statute.  Therefore, defendant clearly would not have been prejudiced by
> this technical change.  If it was not a technical defect, but a fundamental
> issue, then it should have been raised on direct appeal even absent an
> objection.  Matters which could have been or should have been raised on
> direct appeal are not cognizable pursuant to rule 3.850.
>
> Defendant assumes the statutory provisions are mutually exclusive.
> The court is not aware of anything that dictates this result. The definition
> of pawnbroker given to the jury clearly includes a sale of property:

> "Pawnbroker" means any person who is engaged in the business of making pawns; who makes a public display containing the term "pawn," "pawnbroker," or "pawnshop" or any derivative thereof; or who publicly displays a sign or symbol historically identified with pawns. <u>A pawnbroker may also engage in the business of purchasing goods which includes consignment and trade.</u>[FN l: From standard jury instruction 14.7, which tracks the language of section 539.001(2)(i), Florida Statutes.]

> The form in question, which the businesses were required by law to fill out, is the "Florida Pawnbrokers Form." ((trial transcript, page 102); state's exhibit 3 (Capital Coin and Diamond); state's exhibit 4 (Treasure Hut)).  As the Treasure Hut employee described the business, "It's basically a pawnshop without the pawn.  All we do is buy.  We don't pawn . . ." (*Attachment C - trial transcript, page 101*)  Although these incidents clearly involve a sale, there is no reason to believe defendant was improperly charged.

(Ex. K at 47–48) (emphasis in original).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. N).

Although an ineffective assistance of counsel claim is a federal constitutional claim, which the court considers in light of the clearly established law of <u>Strickland</u>, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law." <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of

ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted)[4]; *see also* Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); Herring v. Sec 'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim:  "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should

---

[4] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227 F. App'x 806 (11th Cir. 2007).

have done . . . .  It is a 'fundamental principle that state courts are the final arbiters of

state law, and federal habeas courts should not second-guess them on such matters.'")

(alterations in original) (quoting <u>Agan v. Vaughn</u>, 119 F.3d 1538, 1549 (11th Cir.

1997)).

Here, the state court determined that the evidence was sufficient to survive a

motion for JOA as to the issue of whether the entities to whom Petitioner sold Mr.

Kelly's property were pawnbrokers.  Counts III and V of the Amended Information

charged Petitioner with violating Florida Statutes § 539.001(8)(b)8. (Ex. A at 9).  As

the state circuit court determined, that statute, known as The Florida Pawnbroking Act,

provides, in relevant part:

> (a) At the time the pawnbroker enters into any pawn or purchase
> transaction, the pawnbroker shall complete a pawnbroker transaction
> form for such transaction, including an indication of whether the
> transaction is a pawn or a purchase, and the pledgor or seller shall sign
> such completed form. . . .  In completing the pawnbroker transaction
> form, the pawnbroker shall record the following information, which
> must be typed or written indelibly and legibly in English.
>
> (b) The front of the pawnbroker transaction form must include:
> . . . .
> 8.  A statement that the pledgor or seller of the item represents and
> warrants that it is not stolen, that it has no liens or encumbrances against
> it, and that the pledgor or seller is the rightful owner of the goods and has
> the right to enter into the transaction.  Any person who knowingly gives
> false verification of ownership or gives a false or altered identification
> and who receives money from a pawnbroker for goods sold or pledged
> commits:

a.  If the value of the money received is less than $300, a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

b.  If the value of the money received is $300 or more, a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 539.001(8)(a)–(b).

Florida statutes define "pawnbroker" as follows:

any person who is engaged in the business of making pawns; who makes a public display containing the term "pawn," "pawnbroker," or "pawnshop" or any derivative thereof; or who publicly displays a sign or symbol historically identified with pawns.  A pawnbroker may also engage in the business of purchasing goods which includes consignment and trade.

Fla. Stat. § 539.001(i).  Florida law defines "pawn" as "any advancement of funds on the security of pledged goods on condition that the pledged goods are left in the possession of the pawnbroker for the duration of the pawn and may be redeemed by the pledgor on the terms and conditions contained in this section."  Fla. Stat. § 539.001(h).

Florida courts apply the following standard of review of the sufficiency of the evidence in circumstantial evidence cases:

A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. . . .

It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.

State v. Law, 559 So. 2d 187, 188–89 (Fla. 1989) (footnote and citations omitted).

Here, the state post-conviction court determined that the State presented sufficient evidence to withstand a motion for JOA, under Florida law, as to the charges of defrauding a pawnbroker under § 539.001(8). Indeed, the defense's stipulation that Petitioner "pawned" the items at Capital Coin & Diamond, Inc. and Treasure Hut was competent evidence that Capital Coin & Diamond, Inc. and Treasure Hut engaged in the business of making pawns and were thus pawnbrokers. In light of the state's court's determination of the state law issue underlying Petitioner's IATC claim (i.e., that the evidence was sufficient to withstand a motion for JOA as to Counts III and V as charged in the information), Petitioner failed to show he was prejudiced by defense counsel's failure to move for a JOA.

As an additional basis for denying this IATC claim, the state court determined that under Florida law, the State could have properly amended the charging document in response to a motion for JOA.

Rule 3.140(o) of the Florida Rules of Criminal Procedure provides:

> **Defects and Variances.**  No indictment or information, or any count thereof, shall be dismissed or judgment arrested, or new trial granted on account of any defect in the form of the indictment or information or of misjoinder of offenses or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.

Fla. R. Crim. P. 3.140(o).

"[T]he State must prove the allegations set up in the information or the indictment."  Lewis v. State, 53 So. 2d 707, 708 (Fla. 1951).  "[T]he state may substantively amend an information during trial, even over the objection of the defendant, unless there is a showing of prejudice to the substantial rights of the defendant."  State v. Anderson, 537 So. 2d 1373, 1375 (Fla. 1989); *see also* Lackos v. State, 339 So. 2d 217 (Fla. 1976) (in the absence of a showing of prejudice to the accused, the State was properly permitted to amend the indictment, which charged the accused with buying, receiving, or aiding in the concealment of stolen property, to reflect the actual name of the corporate owner of the stolen property); State v.

<u>Erickson</u>, 852 So. 2d 289, 291 (Fla. 5th DCA 2003) (amendment of the information to state that the defendant failed to comply with the statutory requirement that he register as a sexual predator, instead of sexual offender as originally charged, did not prejudice the defendant, because it only caused the information to read correctly based on the particular facts of the case; and regardless of whether the defendant was a sexual offender or a sexual predator, the defendant still would have been required to abide by the statutory registration requirements); <u>Lenoir v. State</u>, 804 So. 2d 507 (Fla. 3d DCA 2001) (amendment of the information to include a citation to the statute which reclassified the offense, based upon the use of firearm, did not prejudice the defendant as to any claimed defense, and thus was harmless, where the language of original information stated that defendant attempted to kill the victim by shooting him with a firearm, and the amendment caused the information to read correctly); <u>Young v. State</u>, 632 So. 2d 245, 246 (Fla. 3d DCA 1994) (trial court properly allowed the State to amend its information after the jury was sworn, to allege, as an alternative charge, that the defendant "knowingly purchased" the subject cocaine, in addition to being in knowing "actual or constructive possession" of the subject cocaine; the defendant was fully aware prior to trial that the State's only evidence of knowing possession of cocaine, as charged in the original information, was that he had purchased the cocaine from an undercover police officer, and the amendment did not prejudice the defendant

as to any claimed defense in the case); <u>State v. Conte</u>, 516 So. 2d 1115 (Fla. 2d DCA 1987) (defendant did not show prejudice from State's delay in adding conspiracy count to information charging trafficking in cocaine, where the conspiracy count would have been proven with the same witnesses who had been listed for the trafficking charge a year earlier and no further preparation for trial was necessary).

As previously noted, the state court determined that under Florida law, if defense counsel had moved for a JOA on the ground that the person from whom Petitioner received money for the sale of Mr. Kelly's items was not a pawnbroker, as defined under § 539.001, the trial court would have properly granted the State leave to amend the information to allege that Treasure Hut and Capital Coin & Diamond, Inc. were secondhand dealers, instead of pawnbrokers, and to substitute a citation to § 538.04(4), instead of § 539.001(8)(b).  The state court determined that Petitioner would not have been prejudiced by this amendment, because the elements of the crime under sections 538.04 and 539.001 were identical, except as to the definition of the business entities involved, and the essence of the offense related to whether Petitioner falsely verified his ownership of the property, which was the same issue under either statute.

Indeed, the statutes governing pawnbrokers and secondhand dealers, Fla. Stat. § 539.001 and § 538.04, respectively, contain identical provisions defining the crime

of knowingly giving false verification of ownership.  *See* Fla. Stat. §§ 539.001(8)(b),

538.04(4).[5]   Counts III and V of the charging document each charged a criminal

offense, notified Petitioner of the essential elements of the crime, and set forth the

factual basis for the charges.  Specifically, as to Count III, the information alleged that

Petitioner knowingly gave false verification of ownership to Treasure Hut, and

received $300.00 or more in money for a gold wedding ring and silver flatware that he

sold to that business; and as to Count V it alleged that Petitioner knowingly gave false

verification of ownership to Capital Coin & Diamond, Inc., and received less than

$300.00 in money for gold jewelry he sold to that business.  Petitioner failed to show

---

[5] Florida's Secondhand Dealer statute defines a secondhand dealer as "any person, corporation, or other business organization or entity . . .  which is engaged in the business of purchasing, consigning, or trading secondhand goods." Fla. Stat. § 538.03(g). "Secondhand goods" means personal property previously owned or used, . . . which is purchased, consigned, or traded as used property."  Fla. Stat. § 538.03(h).  The statute provides:

(3)  The seller shall sign a statement verifying that the seller is the rightful owner of the goods or is entitled to sell, consign, or trade the goods.

(4)  Any person who knowingly gives false verification of ownership or who gives a false or altered identification, and who receives money from a secondhand dealer for goods sold, consigned, or traded commits:

(a)  If the value of the money received is less than $300, a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b)  If the value of the money received is $300 or more, a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 538.04(3)–(4).

that his trial preparation or trial strategy would have been any different if the charging

document had alleged that he "sold" Mr. Kelly's items to "secondhand dealers" instead

of "pawned" them to "pawnbrokers," and cited to the secondhand dealer statute,

instead of the pawnbroker statute.  Indeed, defense counsel's opening statement to the

jury demonstrates that the focus of the defense was on defending the burglary charge,

not the charges relating to Petitioner's disposition of the items taken during the

burglary:

> Now, Mr. Bishop pawned those items.  He pawned those items at those two pawnshops, left his driver's license and his thumbprint. There's no dispute that he pawned them.  The State is basing their case on a pyramid of inferences.
>
> Who's the prime suspect [in the burglary]?  Well, they want to go to the person who pawned items who identified himself, left identification, left a thumb print.  They want to ride on that inference that, oh, it must have been him who burglarized the house.  But the evidence will show that there is no evidence linking Mr. Bishop to entering, remaining, and taking these items.
>
> If anything, you're [sic] hear from Ms. Rowe that the legal wife of Mr. Kelly brought over by Ms. Rowe, that she went in the house and pawned the items—and took the items and gave it—brought it back to the house, in which Mr. Bishop pawned them.

(Ex. A at 33–34).

In light of the state court's determination that a motion for JOA would not have

been properly granted (because the State presented sufficient evidence to withstand a

motion for JOA, and because the State would have properly been granted leave to amend the information), Petitioner cannot show he was prejudiced by defense counsel's failure to make the motion, which had no reasonable probability of success.[6]

Petitioner failed to demonstrate that the state court's adjudication of Ground One was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

B.    <u>Ground Two:  "Ineffective assistance of counsel: counsel failed to move for judgment of acquital [sic]."</u>

Petitioner claims that defense counsel was ineffective for failing to move for JOA as to the two counts of dealing in stolen property, Counts II and IV (ECF No. 1 at 10–12).  Petitioner alleges the evidence at trial was insufficient to show that he knew or should have known that the property in question was stolen.  Petitioner contends the defense presented evidence that Petitioner had a reasonable explanation for possession of Mr. Kelly's items of personal property, i.e., that Marsha Kelly obtained the items lawfully.  Petitioner alleges Lora Rowe testified that Marsha Kelly was Mr. Kelly's lawful wife, and that Marsha Kelly entered Mr. Kelly's residence with a key,

---

[6] As previously discussed, <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  *See* <u>Purvis</u>, 451 F.3d at 739.  Therefore, Petitioner's argument that he was prejudiced on direct appeal is unavailing.

obtained the items, and then requested that Petitioner sell them.  Petitioner contends he was prejudiced by counsel's failure to move for a JOA, because there is a reasonable probability that the trial court would have granted it, or at least the issue would have been preserved for appeal.

Respondent concedes that Petitioner exhausted this IATC claim in the state courts by presenting it as Grounds Three and Four of his Rule 3.850 motion (ECF No. 21 at 21).  Respondent contends the state court's adjudication of this IATC claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings (*id.* at 21–26).

       1.     Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

       2.     Federal Review of State Court Decision

Petitioner raised this claim as Grounds Three and Four in his Rule 3.850 motion (Ex. K at 8–12).  The state circuit court adjudicated the claims as follows:

> In ground 3 and 4, defendant contends that Mr. Chin was ineffective for not moving for judgment of acquittal as to counts 2 and 4, the dealing in stolen property charges.  He argues that the evidence was insufficient as to whether he knew or should have known that the property was stolen.  There was ample evidence to go to the jury on this

issue and, therefore, a judgment of acquittal on this basis would have been futile.  Attorneys are not required to make futile arguments. Section 812.022(2), Florida Statutes, standing alone is sufficient in this cause to withstand a judgment of acquittal.  The theft occurred on December 22, 2010.  The sale at Treasure Hut occurred on December 23, 2010.  The sale at Capital Coin and Diamond occurred on December 24, 2010.  The Court properly instructed the jury:  "Proof of possession of recently stolen property, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen."  (*Attachment B - page 2*)

Defendant on several occasions states that Mr. Kelly never directly said that defendant stole his property.  That is because Mr. Kelly had no direct knowledge that defendant actually was the one who took his property.  Therefore, he could not testify to this fact.  Mr. Kelly did say repeatedly that these items were stolen from his house.  (*Attachment C - pages 46, 54, 57, 69–70, 74–75, 76–77, 80*)  Mr. Kelly did specifically say that he did not give defendant permission to take his property or pawn them.  (*Attachment C - page 81*)  Since there was not a basis for a judgment of acquittal, the record refutes defendant's claim. Mr. Chin was neither ineffective, nor was defendant prejudiced by the lack of a judgment of acquittal motion on this basis.

(Ex. K at 48).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. N).

To prove the crime of dealing in stolen property, the State was required to prove the following two elements beyond a reasonable doubt:  (1) Petitioner trafficked in the items alleged; and (2) Petitioner knew or should have known that the items were stolen.  *See* Fla. Stat. § 812.019(1); Fla. Standard Jury Instructions in Crim. Cases § 14.2.  "Traffic" means to sell, transfer, distribute, dispense or otherwise dispose of

property; or to buy, receive, possess, obtain control of or use property with the intent to sell, transfer, distribute, dispense or otherwise dispose of that property. *See* Fla. Stat. § 812.012(8). Under Florida law, proof of possession of recently stolen property, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen. *See* Fla. Stat. § 812.022(2). "Stolen property" means property that has been the subject of any criminally wrongful taking. *See* Fla. Stat. § 812.012(7).

The state court's findings of fact as to the testimony adduced at trial are supported by the state court record (Ex. B). In addition to the testimony of Mr. Kelly described by the state court, Mr. Kelly testified that he and Marsha Kelly had been separated for five years and lived in separate residences; and that Marsha Kelly was Petitioner's mother, and Petitioner lived with her in her separate residence. Additionally, Ms. Rowe's testimony, that she told Petitioner (after Marsha Kelly told Petitioner to take the items to the pawnshop, and prior to Petitioner's taking them to the pawnshop) that Marsha Kelly obtained the items from Mr. Kelly's house, together with evidence that the items were very personal to Mr. Kelly (i.e., a wedding band engraved with the initials and wedding date of Mr. Kelly's parents, a class ring from 1935 that said "Gene," and another wedding band with the date of Mr. Kelly's previous marriage) suggested that Petitioner knew or should have known that his mother

unlawfully took the items.  Additionally, the record refutes Petitioner's assertion that Lora Rowe testified that Marsha Kelly entered Mr. Kelly's home with a key.  Ms. Rowe never testified that Marsha Kelly entered the home with a key (*see id.* at 166–78). Furthermore, Mr. McDowell's testimony, that Petitioner asked him to pawn some items for him around the time of the burglary because he lost his identification, suggests Petitioner knew the items were stolen, because his identification was not lost (the property forms from Capital Coin & Diamond Inc. and Treasure Hut include Petitioner's driver's license/official ID number (*see* Ex. K at 304, 306)).

Similar to Ground One, *supra*, the state court has already answered the question of whether  a motion for JOA on Counts II and IV would have been properly granted under Florida law if defense counsel had so moved—the motion would not have been properly granted, because there was sufficient evidence to go to the jury on the issue of whether Petitioner knew or should have known that the items he sold were stolen. *See* State v. Carroll, 404 So. 2d 844, 845 (Fla. 5th DCA 1981) (in prosecution for dealing in stolen property, issue of whether defendant knew that record player was stolen was a jury question once the State proved that defendant was in possession of the recently stolen record player; such proof gave rise to a presumption that defendant knew or should have known that record player was stolen).  This court must defer to the state court's determination of state law.  The failure by Petitioner's counsel to make

a motion for JOA on Counts II and IV cannot be deemed deficient performance, and Petitioner cannot show he was prejudiced by counsel's failure to make the motion, because the motion had no reasonable probability of success under Florida law.

Petitioner failed to demonstrate that the state court's adjudication of Ground Two was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of Strickland.  Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

V.      CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 9th day of June 2016.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. Rule 3-1; 28 U.S.C. § 636.**